NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted October 27, 2014[*]
Decided October 27, 2014

**Before**

WILLIAM J. BAUER, *Circuit Judge*

FRANK H. EASTERBROOK, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 14-1408

| | |
|---|---|
| JAMES TURNER, *Plaintiff-Appellant,* | Appeal from the United States District Court for the Western District of Wisconsin. |
| *v.* | No. 12-cv-699-bbc |
| GARY HAMBLIN, *et al.,* *Defendants-Appellees.* | Barbara B. Crabb, *Judge.* |

**O R D E R**

James Turner is a Muslim inmate incarcerated at Columbia Correctional Institution, a maximum-security prison in Wisconsin. Turner sued members of the prison staff, seeking punitive damages from them for violating the First Amendment, *see* 42 U.S.C. § 1983, and the Religious Land Use and Institutionalized Persons Act, *see* 42 U.S.C. § 2000cc–1. He raises two accusations: First, over a five-year period staff

---

[*]After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus the appeal is submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2)(C).

impeded his free exercise of religion by canceling Islamic services when non-prisoners were unavailable to lead the services, rather than allowing services to proceed with inmate leaders. Second, staff canceled Islamic services often but "Christian services never get canceled." At screening, *see* 28 U.S.C. § 1915A, the district court told Turner that damages are unavailable under RLUIPA, *see Nelson v. Miller*, 570 F.3d 868, 883–85, 889 (7th Cir. 2009), so it advised him to add a request for injunctive relief to his complaint or face dismissal of his RLUIPA claim. Turner responded with two motions to withdraw his RLUIPA claim. The court agreed to dismiss that claim, stating that Turner "will proceed only on his free exercise claim under the First Amendment." The district court later granted the defendants' motion for summary judgment. Because prison staff violated no clearly established law under the First Amendment, we affirm.

Since we are reviewing a grant of summary judgment, we construe the evidence and draw all reasonable inferences in favor of Turner, the opposing party. *See Williams v. City of Chicago*, 733 F.3d 749, 752 (7th Cir. 2013). Wisconsin's Department of Corrections requires that "[c]ongregate religious services" and religious study groups held in Wisconsin prisons "be led by an approved spiritual leader/clergy, volunteer, or Chaplain." This policy prohibits inmates from "lead[ing]" or "conduct[ing]" religious services or groups. Columbia's security director explained the policy's rationale: Allowing inmates to lead religious activities could create "a perception of authority over other inmates," "allow an inmate to influence other inmates' actions," "blur[] the necessary distinction between staff and inmates," and increase gang activity in the prison for which religious services are often a cover.

Columbia uses outside volunteers to lead some Islamic services. Although the Department of Corrections employs two Muslim chaplains, they are not assigned to Columbia and are unable to lead services regularly at that prison. Instead, Columbia's chaplain, who is Protestant, recruits non-inmate, Muslim volunteers to lead Islamic services at the prison. Those services include Jumuah, a group prayer service held on Fridays, and Taleem, a religious study period generally held weekly.

According to Turner, attending Jumuah every Friday is a "fundamental" tenet of Islam, and the prison prevented him from practicing it. In the five years between July 2007 and July 2012, Columbia canceled Jumuah and Taleem services more than 120 times because Muslim volunteers were not available. By contrast, because Columbia has a resident chaplain to lead Christian worshipers in communal prayer and study, the prison canceled Christian services no more than five times in the same five-year period.

The defendants raised four arguments in moving for summary judgment. First, they contended that Turner could not show that the ban on allowing inmates to lead religious services substantially burdened his rights under the Free Exercise Clause. *See Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699 (1989). Second, the defendants continued, the policy was reasonably related to "legitimate penological interests" in prison security. *Turner v. Safley*, 482 U.S. 78, 89 (1987). Third, they argued that they were entitled to qualified immunity. Finally, they said that punitive damages, the only requested relief, were unavailable because Turner could not prove that they had acted recklessly or with "callous indifference."

Turner replied with four contentions of his own. He asserted, first, that in light of the frequently canceled Islamic services, the ban on inmate-led services substantially burdened his free religious exercise. Second, he continued, the defendants were not immune from suit because of two court rulings: The Ninth Circuit has held that maximum-security inmates' religious exercise was substantially burdened by a policy barring them from attending group worship, *see Greene v. Solano Cnty. Jail*, 513 F.3d 982, 985, 988 (9th Cir. 2008). And the First Circuit ruled that an inmate made a prima facie showing that his religious exercise was substantially burdened by a policy barring inmates from preaching to one another, *see Spratt v. Rhode Island Dep't of Corr.*, 482 F.3d 33, 34–35, 38 (1st Cir. 2007). Third, he advanced an alternative legal theory—the defendants violated the Establishment Clause because the prison "intentional[ly] created" the ban on inmate-led services in order to have a "disparate impact" on Muslim religious practices. Fourth, Turner tried to resurrect his abandoned RLUIPA claim to exploit its more free-exercise-friendly standard of proof, *see Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013), and ask for a declaration that the defendants had violated his religious exercise. He explained that he had moved to dismiss that claim only insofar as it requested injunctive relief.

The district court granted the defendants' motion for summary judgment. First, it explained, the defendants were entitled to qualified immunity on Turner's Free Exercise claim because clearly established law does not require prison staff "to hold religious services for inmates if no qualified nonprisoners are available to lead the service." Next, the court rejected Turner's Establishment Clause claim that the policy barring inmates from leading services discriminated against Muslims. It reasoned that the more-frequent cancellation of Islamic services relative to Christian services did not prove intent. Finally, the court refused to allow Turner to revive his dismissed RLUIPA claim.

On appeal Turner first challenges the district court's ruling that qualified immunity defeats his claim that canceling services, rather than allowing inmates to lead them, violates his rights under the Free Exercise Clause. Qualified immunity protects government officials from suits for damages when their actions do not violate clearly established constitutional or statutory rights. *See Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (internal quotations and brackets omitted); *see al-Kidd*, 131 S. Ct. at 2083. Once qualified immunity is raised, the plaintiff must show that the defendant's action violated a clearly established right. *See Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011). Furthermore, we may decide that a defendant's action did not violate a clearly established right without first determining whether a constitutional right was violated. *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

Turner may recover damages here only if it is clearly established that the defendants substantially burdened his free exercise of religion without a justification "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. For three reasons, however, it is not "beyond debate," *Reichle*, 132 S. Ct. at 2093, that prison staff violated Turner's free religious exercise by prohibiting group worship when a non-inmate leader was unavailable. First, even if we accept Turner's assertion that attending the weekly Jumuah service is a "fundamental" tenet of Islam, *see Hernandez*, 490 U.S. at 699, this circuit has already held that prisons may ban inmate-led services to prevent the rise of inmate authority figures, the justification raised here. Prisons "need not … allow inmates to conduct their own religious services, a practice that might not only foment conspiracies but also create (though more likely merely recognize) a leadership hierarchy among the prisoners." *Johnson-Bey v. Lane*, 863 F.2d 1308, 1310 (7th Cir. 1988) (reversing order that prison allow inmate adherents of Moorish Science Temple of America to conduct services); *see also Hadi v. Horn*, 830 F.2d 779, 784–85 (7th Cir. 1987); *Baranowski v. Hart*, 486 F.3d 112, 117, 124–25 (5th Cir. 2007); *Adkins v. Kaspar*, 393 F.3d 559, 571 (5th Cir. 2004). This case law alone dooms Turner's case.

Second, Turner has not pointed to any clearly established law that required Columbia to hire a Muslim chaplain to lead services. In fact prisons need not provide chaplains "without regard to the extent of the demand," *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972), and Turner did not submit any evidence showing that the defendants disproportionally allocated resources to inmates practicing other religions, *see Maddox v. Love*, 655 F.3d 709, 719 (7th Cir. 2011).

Third, the two cases that Turner identified do not clearly establish that the ban on inmate-led worship violated his right to free religious exercise. The policy at issue in the Ninth Circuit's decision in *Greene*, 513 F.3d at 984, 988, is not analogous because it banned inmates from *attending*, not leading, religious services. The First Circuit's decision in *Spratt*, 482 F.3d at 34–35, 38, concerned a ban on inmate-led preaching, so it is more on point. But that decision merely ruled that the plaintiff presented a prima facie case. Anyway, we have declined to find a matter clearly established "based on the existence of one case from another circuit." *Kikumura v. Turner*, 28 F.3d 592, 596 (7th Cir. 1994); *see also Becker v. Bateman*, 709 F.3d 1019, 1024–25 (10th Cir. 2013); *Kelly v. Curtis*, 21 F.3d 1544, 1551–52 n.6 (11th Cir. 1994). Accordingly, qualified immunity blocks the Free Exercise claim.

Next, Turner maintains that the prison's ban on inmate-led worship discriminated against Muslims and therefore violated the Establishment Clause. The Establishment Clause prohibits the government from favoring one religion over another "without a legitimate secular reason for doing so." *Kaufman*, 733 F.3d at 696. But, as we have already observed, the prohibition's goal of preventing inmates from gaining influence over other inmates is legitimate. *See Johnson-Bey*, 863 F.2d at 1311 (recognizing "reasonableness of a regulation banning lay inmates from assuming positions of religious authority"); *Hadi*, 830 F.2d at 784–85. Turner replies by speculating about a possible, illegitimate reason for the ban on inmate-led worship: It was "intentional[ly] created to have a disparate impact on the Religious Practice opportunities of Muslim[s]." But as we have previously remarked about prison rules, "[i]t is not clear why one bad motive would spoil a rule that is adequately supported by good reasons," such as the security rationale here. *Hammer v. Ashcroft*, 570 F.3d 798, 803 (7th Cir. 2009) (en banc). In any event Turner's speculation is not based on his personal knowledge, so he does not rebut the security director's legitimate explanation. *See* FED. R. CIV. P. 56(c)(4).

Finally, Turner challenges the district court's refusal to let him revive his withdrawn claim under RLUIPA. In Turner's view, the court "trick[ed]" him into moving to withdraw that claim by failing to advise him that RLUIPA provides for both declaratory and injunctive relief. But the district court did not abuse its discretion in refusing to allow Turner to reintroduce that claim. "District judges have no obligation to act as counsel or paralegal to *pro se* litigants," *Piller v. Ford*, 542 U.S. 225, 231 (2004), so the district court cannot be faulted simply for not teaching Turner about all relief available under RLUIPA. Moreover, if Turner wanted to reverse himself to pursue declaratory relief under RLUIPA, nothing stopped him from timely moving to amend

his complaint. *See* FED. R. CIV. P. 15(a)(2). Instead, after he twice moved to abandon his RLUIPA claim, he delayed eleven months and announced his about-face only in his response to the defendants' motion for summary judgment. But by then the defendants had already relied on his withdrawal in briefing their motion for summary judgment. *See Johnson v. Cypress Hill*, 641 F.3d 867, 872–73 (7th Cir. 2011). Accordingly, the court reasonably declined to allow Turner to reverse his waiver of the RLUIPA claim.

AFFIRMED.